## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| ROBERT FARRINGTON, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. CV-2023- |
| FAIRFIELD POLICE DEPARTMENT; | ) | |
| THOMAS GOULD, CHIEF OF FAIRFIELD | ) | |
| POLICE DEPARTMENT; OFFICER | ) | |
| DAKOTA WILLHOITE; SOMERSET | ) | |
| REGIONAL COMMUNICATIONS CENTER; | ) | |
| MIKE SMITH, DIRECTOR SOMERSET | ) | |
| REGIONAL COMMUNICATIONS CENTER; | ) | |
| JANE/JOHN DOE, EMPLOYEE OF SRCC; | ) | |
| JANE/JOHN DOE II, EMPLOYEE OF SRCC; | ) | |
| AUGUSTA POLICE DEPARTMENT; | ) | |
| JARED MILLS, CHIEF OF AUGUSTA | | |
| POLICE DEPARTMENT; SERGEANT TORI | | |
| TRACY;  OFFICER SABASTIAN GUPTILL; | | |
| | | |
| Defendants. | | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### *Introduction*

1. In the early morning hours of November 23, 2019, Plaintiff Robert Farrington lived through an experience that was as traumatic as anything he had seen during his two tours of duty in Afghanistan.  That night, he was asleep in his home when his terrified fiancée awakened him to report that someone was banging on their door and appeared to be in their backyard.

2. Mr. Farrington, a twenty-seven year old, honorably-discharged Marine veteran and certified firearms instructor, told his fiancée to call 911 and grabbed his lawfully-owned weapon to investigate what was going on.

3. Approaching a sliding glass door, Mr. Farrington pointed his weapon downward in the safety position and turned on the light. He then placed the weapon on a table so that he could reach down and open the sliding glass door.

4. Just then, a person on the other side of the door yelled, "He's got a gun!" and began shooting at him. At least one bullet struck him, with one entering his left gluteal muscle, grazing the posterior left iliac bone, causing a fracture, skimming the posterior of the sacrum, and ultimately lodging just posterior to the right iliac bone.  He ducked and rolled away from the shooter in agonizing pain, but the shooter kept going until twelve rounds were fired.

5. Unbeknownst to Mr. Farrington, his assailant was not a burglar but a member of the Augusta Police Department, and the nightmare he had experienced was the culmination of a series of grave intrusions into his constitutional rights.  It had begun earlier that night, in the nearby town of Fairfield, when police officers unlawfully used a criminal information database to knowingly enter false information suggesting that Mr. Farrington was suspected of a felony, that his alleged victim was in danger, and that a warrant had issued for his arrest.  It ended when three Augusta police officers decided to execute the nighttime home arrest, despite not having a warrant or belief of exigent circumstances, and terrifying and then shooting Mr. Farrington in his own home.

6. Mr. Farrington's gunshot wounds have required years of treatment and he still suffers from agonizing pain, requires a cane to walk, and has been deemed permanently disabled.  In addition to his physical injuries, the experience of November 23, 2019 severely exacerbated Mr. Farrington's combat-induced PTSD.

7. In this lawsuit, Mr. Farrington seeks to vindicate his constitutional right to be secure in his person and home and hold responsible the actors who abused state power and caused him to be shot in his own home.

## JURISDICTION AND VENUE

8. This action arises under 42 U.S.C. §§1983 and 1985, The Fourth Amendment to the United States Constitution; Article 1, Section 5 of the Maine Constitution and 5 M.R.SA § 4682 (the Maine Civil Rights Act); and 15 M.R.S.A. § 704; and 14 M.R.S.A. § 8101 *et seq*. (the Maine Tort Claims Act).

9. This Court has original jurisdiction of the Plaintiff's federal claims pursuant to 28 U.S.C. §§1331 and 1332.

10. This Court has supplemental jurisdiction over the claims brought under the Maine State Constitution pursuant to 28 U.S.C. § 1367, because these claims are so related to the federal claims that they form part of the same case or controversy.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), one or more of the Defendants resides in the District of Maine and the events giving rise to the claims asserted in this lawsuit arose in this judicial district.

12. The Plaintiff, Robert Farrington, at all times relevant in this complaint resided in Augusta, County of Kennebec, State of Maine.

13. The Defendants are as follows:

14. Fairfield Police Department and the following employees: Chief Thomas Gould and Officer Dakota Willhoite.

15. Somerset Regional Communications Center and the following employees: Mike Smith, Director; Jane/John Doe I, Dispatch operator; Jane/John Doe II, CJIS Systems Officer

16. Augusta Police Department and the following employees: Chief Jared Mills, Sergeant Tori Tracy and Officer Sabastian Guptill.

## FACTS

17. Just past 11 pm on November 23, 2019, Defendant Officer Dakota Willhoite of Fairfield Police Department took an in-person report from an alleged victim claiming that Plaintiff Robert Farrington had committed domestic abuse assault against her in her Fairfield home over an hour earlier.

18. Defendant Willhoite had several indicia that the alleged victim, who will be identified by her initials, V.G., was not in present danger. For example, she was physically present at Fairfield Police Department when she made her complaint against Farrington, and she reported to Defendant Willhoite that Farrington had left her residence.

19. In fact, V.G. was not in any present danger; nor had she been. Her allegations against Mr. Farrington were false.

20. V.G. described Farrington's vehicle and provided the location of his residence in Augusta.

21. V.G. was sent home by Defendant Willhoite and others after taking her complaint.

22. After V.G.'s departure and as a result of her complaint, Defendant Willhoite and Fairfield Police Officer Blake Wilder searched the Fairfield downtown area and determined that Mr. Farrington's vehicle was not present.

23. Believing Mr. Farrington had returned home to his residence in Augusta, Maine, Defendant Willhoite and Officer Wilder decided to use Somerset County Dispatch to enter a "temporary felony want," otherwise known as a "temporary warrant," into the National Crime Information Center.

24. According to the United States Department of Justice (USDOJ), the National Crime Information Center or "NCIC" is a national information system linking criminal (and authorized noncriminal) justice agencies located in the 50 states, the District of Columbia, U.S. territories and possessions, and select foreign countries to facilitate the cooperative sharing of criminal justice information.

25. The Federal Bureau of Investigation's (FBI) Criminal Justice Information Services ("CJIS") Division operates the NCIC.

26. The NCIC maintains two types of files: "persons files" and "property files."

27. The "temporary felony want" falls under the category of "persons files."

28. Despite being nicknamed a "temporary warrant," by some law enforcement officers in Maine, a "temporary felony want" is not authorized by common law or statute, and it is not a legal warrant conforming with the constitutional requirements of the Fourth Amendment.

29. A "temporary felony want" does not follow the statutory requirements of Maine Statute 15 M.R.S. §651, which requires that a warrant be issued only "in response to a properly

sworn charging instrument or affidavit, or both, based on probable cause to believe that an individual has committed a crime."

30.  Nor does a "temporary felony want" conform with the warrant requirements established by the Fourth Amendment of the United States Constitution, which requires that a warrant of arrest must be issued by a "neutral and detached magistrate" who is capable of making a decision whether probable cause exists, based on information provided under oath or affirmation."  According to the NCIC, a "temporary felony want" is an administrative notation made by law enforcement officers for the purposes of sharing information with other law enforcement officers and does not include judicial review or approval.

31. Maine's Attorney General's Office has directed that "a 'temporary felony want' may be entered into the state law enforcement system when a law enforcement agency has a need to take prompt action to establish a "want" entry for the apprehension of a person who has committed, or the officer has reasonable grounds to believe has committed, a felony level crime and who may flee across jurisdictional boundaries and circumstances preclude the immediate procurement of an arrest warrant."

32. According to the USDOJ, agencies may enter temporary "felony want records" to "take prompt action to apprehend a person suspected of committing a felony when circumstances prevent the agency from immediately obtaining a warrant."

33. To access the NCIC, agencies including Defendant Fairfield Police Department are required to comply with the CJIS Systems User Agreement.

34. Included in CJIS Systems User agreement, among other things, is a requirement that systems be in place to ensure that "only complete, accurate, and valid information is maintained in the CJIS systems."

35. In addition, each accessing agency must provide training to users including compliance with operator training mandates.

36. The CJIS user agreement and training requirements are part of a safety system meant to protect against abusive and unconstitutional use of the NCIC.  Because of their importance, every agency using NCIC is required to establish a CJIS Systems Officer who is responsible for complying with the duties and responsibilities adopted by CJIS to "ensure the reliability, confidentiality, completeness, and accuracy of all information contained in, or obtained by means of, the CJIS Systems."

37. Defendants Willhoite, Doe I and the Fairfield Police Department violated the foregoing CJIS requirements when they entered a "temporary felony want" for Robert Farrington.  The reports of Officers Willhoite and Wilder indicate that they were not investigating a felony arising out of the allegations made by V.G., but rather misdemeanor class D offenses in violation of 17-A M.R.S. A. § 207-A and 17 M.R.S.A. § 1031(1)(D).

38. Aware that he had logged V.G.'s report as a misdemeanor allegation, Defendant Willhoite nonetheless willingly entered Farrington's name and information to Somerset County dispatch as a "temporary felony want."

39. Defendant Willhoite and Officer Wilder referred to their "temporary felony want" entry as a "temporary warrant," even though it was not a legal warrant.

40. In fact, no warrant for the arrest of Robert Farrington was applied for nor received by any members of Fairfield Police Department on November 23 or 24, 2019.

41. Defendant Willhoite contacted Augusta Police Department and reported that there had been a "temporary warrant" issued for Robert Farrington, and asked them to arrest Farrington at his residence.

42. Upon receipt of the call from Fairfield, the August Police Department did not investigate the allegations, apply for an arrest warrant, or apply for a search warrant of the residence.

43. Instead, Defendant August Police Sergeant Tori Tracy immediately relayed the information about the "temporary warrant" to Defendant Augusta Police Officer Sabastian Guptill, and Augusta Police Officers Aaron Paradis and Brett Lowell, provided them with Farrington's home address in Augusta, and instructed them to arrest Mr. Farrington.

44. Upon receipt of this message and the command, Defendant Guptill and Officers Paradis and Lowell then drove to Mr. Farrington's residence to effectuate a nighttime, warrantless arrest.

45.  At the time they attempted to execute the warrantless arrest, Defendant Guptill, was aware that the alleged victim, V.G. was safe in Fairfield, and he had no information indicating there was an ongoing emergency or any other type of exigent circumstances at Mr. Farrington's residence.

46. Shortly after midnight, Defendant Guptill, and Officers Paradis, and Lowell each traveled to Mr. Farrington's home in separate cruisers.  None of them used sirens or flashing lights.

47. As they approached Mr. Farrington's home, two out of three of the Augusta police cruisers turned off their headlights.

48. Defendants approached the house quietly, and did not identify themselves as officers.

49. Upon their arrival, Defendant Guptill recognized Mr. Farrington's vehicle in the driveway based on the information provided by Fairfield Police Department.

50. Defendants Lowell and Paradis approached an enclosed porch adjacent to the driveway, which was the identifiable primary entrance to the residence.

51. Defendant Guptill immediately went onto the lawn and traveled within the curtilage of the home to the right side of the residence.

52. Defendant Guptill then approached the side of the home and looked into the house. He saw military photos and certificates bearing Farrington's name.

53. Based on his observations from the curtilage, Defendant Guptill concluded that Farrington might have prior military training.

54. Although unknown to Defendant Guptill at the time, Mr. Farrington had previously served in multiple deployments with the US Marine Corps, and had been diagnosed with PTSD and tinnitus resulting from a combat deployment to Afghanistan in 2013.

55. Mr. Farrington had been shot during one of his combat deployments with the U.S. Marine Corps.

56. After recovering from the physical wounds from being shot and addressing his PTSD, he had returned to the Marine Corps for a final deployment.

57. When the officers approached and surrounded the home, Mr. Farrington was asleep in the home with his fiancée, Rebecca L'Italien.

58. Because of hearing difficulties associated with his combat-induced tinnitus, Mr. Farrington had installed a special doorbell that rings at a frequency that he could hear and would awaken him – but none of the officers rang the doorbell, and he did not awaken.

59. After looking through the window, Defendant Guptill continued to the rear corner of the residence.

60. There, Defendant Guptill knocked on a sliding glass door for several minutes with no response.

61. Meanwhile, Officers Lowell and Paradis knocked on the front door for several minutes with no response.

62. After approximately eight and a half minutes of knocking, surrounding the residence and peering into the windows of the residence, all while failing to identify themselves as law enforcement officers, the officers decided to leave.

63. Defendant Guptill and Officers Paradis and Lowell regrouped at their cruisers and discussed whether or not to contact the Fairfield Police Department.

64. Defendant Guptill determined that they would close the encounter as "no contact" and depart from the scene with no further action.

65. Defendant Guptill then entered his cruiser and began to depart.

66. Officer Paradis entered his vehicle but did not leave the driveway.

67. Officer Lowell remained seated in his cruiser parked in the driveway while entering the information into the system.

68. Meanwhile, Ms. L'Italien had finally awoken from the banging.

69. Afraid, she woke Mr. Farrington.

70. Mr. Farrington directed Ms. L'Italien to call 911 while he investigated the source of the noise.  For their protection he took his lawfully owned firearm (a Beretta 9 mm gifted to him by his Marine Corps Unit to replicate the model issued during their service) and made his way to the sliding glass door around the side of the home.

71. At the same time as he was finalizing the report, Officer Lowell observed that the interior lights of Mr. Farrington's residence had turned on and he immediately reported this to the other officers via radio.

72. Defendant Guptill quickly reversed course, and pulled back into the driveway.

73. Again, neither Defendant Guptill, nor Officers Paradis or Lowell activated lights or sirens in their vehicles.

74. Again, none of them identified themselves as members of law enforcement.

75. After pulling back into Farrington's driveway, Defendant Guptill immediately made his way around the side of the house, on the home's curtilage and to the sliding glass door.

76. Meanwhile, Farrington approached the door from within his home.  Following his military training, and his experience as a certified firearms instructor, he did not point his gun straight ahead, where a person might be, but instead held the firearm in a safety position at his side, pointing down.

77. He and Ms. L'Italien had turned on multiple interior lights, illuminating him from within.

78.  By now, Ms. L'Italien was on the phone with a 911 operator who did not inform her that law enforcement was present at their home.  Ms. L'Italien reported that she thought they were victims of a burglary attempt.

79. Mr. Farrington wanted to open the sliding glass door to investigate what was happening outside, but in addition to being locked, it was also physically blocked shut with a piece of wood in the track of the slider.

80. Mr. Farrington put his firearm down  on a side table and then leaned on the sliding door to unlock it.

81. Then, with no firearm in his hand, he bent down with his back turned slightly to the door to remove the piece of wood so he could open the sliding door.

82. At that point, Defendant Guptill yelled, "he's got a gun!  Augusta Police!" and immediately thereafter fired multiple rounds from his service weapon, a .40 caliber Glock Model 23 semi-automatic pistol.

83. Defendant Guptill fired multiple shots through the glass door, directly at Farrington.

84. Farrington was struck from behind in his lower left back.

85. He grabbed his firearm, ducked and rolled away from the sliding glass door.

86. A bullet had penetrated Plaintiff's left gluteal muscle, grazed the posterior left iliac bone causing a fracture, skimming the posterior of the sacrum and ultimately lodging just posterior to the right iliac bone.

87. Defendant Guptill continued firing through the glass door and into the side of Farrington's residence.

88. Ultimately, Defendant Guptill discharged 12 rounds into Plaintiff's home.  Plaintiff never fired a single shot.

89. Robert Farrington underwent surgery with extensive recovery time to attempt to repair the damage to his hip and back from the bullet wound.

90. Mr. Farrington attended years of physical rehabilitation in an attempt to regain his former health.

91. Mr. Farrington tried to remain employed for years after this incident, but he was eventually deemed permanently disabled as a result of this injury and placed on permanent disability.

92. Prior to this incident, Mr. Farrington's combat-related PTSD had been well-controlled and he was experiencing minimal symptoms.  As a result of this incident he now experiences PTSD symptoms on a daily basis.

## COUNT I VIOLATION OF THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION UNDER 42 U.S.C. § 1983
### Against Defendant Sabastian Guptill

93. Plaintiff repeats and reasserts the allegations of the foregoing paragraphs as if fully set forth herein.

94. The Fourth Amendment of the United States Constitution guarantees that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

95. The Fourth Amendment requires that all arrests of a person be supported by a warrant unless a judicially recognized exception exists.

96. A warrant of arrest must be issued by a "neutral and detached magistrate" who is capable of making a decision whether probable cause exists and such decision must be supported by the submission of information under oath or affirmation.

97. The requirement of neutrality cannot be met when the issuing party is himself engaged in law enforcement activities.

98. The requirement of probable cause supported by oath or affirmation is satisfied by either a personal appearance and verbal statement under oath, or a properly sworn affidavit.

99. The Fourth Amendment protection also extends to homes and their curtilage.

100. The Fourth Amendment requires that a search of a home and/or its curtilage be supported by a search warrant unless a judicially defined exception to the warrant requirement exists.

101. Maine State Law imposes additional requirements to be met before a nighttime warrant may be granted and executed.

102. The Fourth Amendment also protects citizens from the excessive use of force by officers during the course of an arrest, investigatory stop, or other seizure. Officers are entitled to use only such force as is "objectively reasonable" to effectuate a seizure. Even if a seizure itself is lawful in its purpose, it violates the Fourth Amendment if a police officer uses excessive force.

103. Defendant Guptill violated the Fourth Amendment protection of Farrington's home when he entered the curtilage of Farrington's residence without having a warrant to do so. Defendant Guptill's warrantless, nighttime trespass onto Farrington's curtilage was not justified by any recognized exceptions to the Fourth Amendment's warrant requirement.

104. Defendant Guptill then further violated Farrington's Fourth Amendment right to be free from unreasonable seizure by seizing Farrington without possessing an arrest warrant. Defendant Guptill's warrantless, nighttime seizure of Farrington from his home was not justified by any recognized exceptions to the Fourth Amendment's warrant requirement.

105. Finally, Defendant Guptill violated the Fourth Amendment in the most egregious manner by using deadly force in his effort to unlawfully seize Farrington.

106. At the time he fired at and shot Farrington, Defendant Guptill possessed no lawful basis to seize Farrington. No amount of force, however small, is objectively reasonable under the Fourth Amendment to effectuate an unlawful seizure.

107. Even had Defendant Guptill had a lawful reason to seize Farrington, the use of deadly force to do so was not objectively reasonable under the Fourth Amendment under the circumstances.

108. Nor was Defendant Guptill's use of deadly force against Farrington justified by the principle of self-defense.

109. Farrington lawfully owned and possessed his firearm.  He was in his own home in the middle of the night.  Farrington did not display his firearm at Guptill in a threatening manner. Furthermore, Farrington would have been justified to use deadly force or the threat of deadly force, had he wanted to, because he reasonably believed that the third party (later identified as Guptill) was attempting to enter Farrington's dwelling place and deadly force was necessary to prevent infliction of bodily injury upon Farrington or Rebecca L'Italien.

110. Defendant Guptill was only in a position to react to the sight of Farrington's firearm because he unlawfully trespassed on Farrington's property in violation of the Fourth Amendment.

111. An officer's belief that he or she is in imminent danger does not justify the use of deadly force when the emergency is of the officer's own making and he was not lawfully present in the location from which he perceived the danger.

112. By the foregoing actions, Defendant Guptill violated Plaintiff's rights as established by the Fourth Amendment to the U.S. Constitution.

113. Defendant Guptill exceeded the scope of his discretion, as no legal basis for Farrington's detention, seizure or arrest existed at the time of his entry onto Farrington's property, and no imminent threat of harm existed at the time Defendant Guptill shot Mr. Farrington.  The unlawful property invasion, warrantless arrest, and subsequent use of deadly force when Robert Farrington posed no immediate threat to the safety of officers or others shocks the conscience.

114. As a result of Defendants' violations of Plaintiff's constitutional rights, plaintiff has suffered permanent physical injury, pecuniary losses, emotional distress and other damages, both compensatory and punitive, for which he seeks compensation.

**COUNT II CONSPIRACY TO VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. § 1985**

**Against Defendant Willhoite, Doe I, Tracy and Guptill**

115. Plaintiff repeats and reasserts the allegations of the foregoing paragraphs as if fully set forth herein.

116. Defendant Willhoite entered Robert Farrington's name into the NCIC law enforcement database and attached the "temporary felony want" moniker.

117. Defendant Willhoite did so despite knowing that V.G.'s allegations were categorized as misdemeanor charges.

118. Furthermore, Defendant Willhoite knew that using the "temporary felony want" system was inappropriate because V.G. was not currently in danger.

119. Defendant Willhoite had no legal basis upon which to seek a warrantless arrest of Farrington.

120. At the request of Defendant Willhoite, Jane/John Doe I entered the "temporary felony want" into the NCIC attached to Robert Farrington's name.

121. Jane/John Doe I did so in violation of NCIC standards, and knowing that there was neither probable cause to believe a felony had occurred nor that exigent circumstances existed.

122. Defendant Willhoite contacted Augusta Police Department with the express purpose of requesting that August Police Department officers arrest Robert Farrington at his own home.

123. Because of the foregoing actions, which were knowingly false representations that Mr. Farrington was suspected of committing a felony and that there were circumstances requiring his immediate arrest, Defendants Willhoite and Jane/John Doe I initiated the warrantless arrest of Mr. Farrington in violation of his Fourth Amendment right to be free from unreasonable search or seizure.

124. Defendant Sergeant Tori Tracy acted on the basis of Defendant Willhoite's request and ordered Defendant Guptill, and Augusta Officers Lowell and Paradis to respond to Farrington's home.

125. Defendant Tracy did so despite knowing that no warrant for Farrington's arrest had been applied for or received, that no search warrant for Farrington's residence had been applied for or received, and that no exception to the warrant requirement existed to justify officers effectuating a night-time warrantless arrest of Farrington and a search of his home.

126. Defendant Guptill, and Augusta Officers Lowell and Paradis followed Defendant Tracy's order to respond to Robert Farrington's residence despite knowing that they did not possess an arrest warrant, search warrant, or any exception that would allow the warrantless search of Farrington's property or the warrantless arrest of Robert Farrington.

127. The actions of the individual defendants exhibit a reckless disregard for the rights of Mr. Farrington.

128. As a result of defendants' violations of plaintiff's constitutional rights, plaintiff has suffered permanent physical injury, pecuniary losses, emotional distress and other damages, both compensatory and punitive, for which he seeks compensation.


## COUNT III MONELL LIABILITY FOR VIOLATION OF THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION UNDER 42 U.S.C. § 1983
### Against the City of Fairfield Police Department and Police Chief Gould

129. Plaintiff repeats and reasserts the allegations of the foregoing paragraphs as if fully set forth herein.

130. Defendants Fairfield Police Department and Fairfield Police Chief Gould have adopted a policy or custom of encouraging and allowing the use of "temporary felony wants" in the NCIC system in a manner which promulgates the types of Constitutional violations described above.

131. In the instant case, Fairfield police officers acted pursuant to this policy to request the arrest of Robert Farrington despite having no legal authority to do so.

132. Defendants Fairfield Police Department and Fairfield Chief Gould have allowed their officers to adopt a custom of referring to "temporary felony wants" as "temporary warrants," knowing that this misnomer falsely indicates that a warrant has issued.

133. Referring to these requests as "temporary warrants" promulgates the unconstitutional use of such entries by encouraging officers to rely on them as if the process complies with Fourth Amendments warrant requirements.

134. The foregoing policy and custom of misuse and misidentification of the NCIS's "temporary felony want" process has encouraged a culture in which officers believe they are justified to take action on a data entry as if they had a judicially-approved warrant when in fact no warrant nor warrant exception exists.

135. In the instant case, this policy directly led to the violation of Farrington's constitutional rights.

136. Defendants Fairfield Police Department and Police Chief Gould knew or should have known that such a policy or custom would lead to violation of citizens' Constitutional rights.

137. As a result of Defendants' violations of plaintiff's constitutional rights, plaintiff has suffered permanent physical injury, pecuniary losses, emotional distress and other damages, both compensatory and punitive, for which he seeks compensation.

## COUNT IV MONELL-IABILITY- FOR VIOLATION OF THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION UNDER 42 U.S.C. § 1983 Against Defendants Doe I, Doe II, Mike Smith, and Somerset County

138. Plaintiff repeats and reasserts each and every allegation of the foregoing paragraphs as if fully set forth herein.

139. Defendant Jane/John Doe I, an unknown Somerset County dispatch operator, entered Defendant Willhoite's complaint into the NCIC as a "temporary felony want in violation of the definition of a temporary felony want."

140. Defendant Jane/John Doe II, an unknown CJIS Systems Officer for Somerset County was responsible for the training, oversight and use of the NCIC.

141.  Defendant Jane/John Doe II allowed the improper use of the NCIC system for the purpose of entering misdemeanor arrest requests as "temporary felony wants."

142. Defendant Mike Smith, Director of Somerset Regional Communications Center and Emergency Management was responsible for overseeing the proper use of the NCIC system.

143. By adopting a practice or custom of requesting and entering a "temporary felony want" on the basis of suspicion of misdemeanor charges in direct contravention of NCIC's user requirements, the individual dispatch officer, Jane/John Doe I, the CJIS systems officer, Jane/John Doe II, Mike Smith and the Somerset Regional Communications Center have allowed the NCIC system to be used in a manner in that routinely violates citizens' Fourth Amendment rights.

144. When such "temporary felony wants" are granted upon request when no probable cause for a felony nor exigent circumstances exist, the likely outcome is that the subject of the temporary felony want is exposed to the risk of their Fourth Amendment rights being violated by any responding officer or agency.

145. The Somerset County Defendants knew or should have known that such a policy would lead to violation of citizens' Fourth Amendment Rights.

146. In the instant case, the individual dispatcher knew or should have known that Robert Farrington's Fourth Amendment rights would likely be violated as a direct result of the entry of the "temporary felony want" into the NCIC system under his name.

147. In addition, Defendants Doe II, Mike Smith and the Somerset Regional Communications Center failed to provide and maintain proper training and monitoring standards regarding the use of the NCIC system.

148. Because of the constitutional nature of the information and use to which that information is put, the NCIC system itself has strict policies and procedures and user-agreements to minimize the misuse of the system or mis-entry of information.

149. By employing this system, Defendants Doe II, Mike Smith and the Somerset Regional Communications Center were aware of the obvious need to provide adequate training regarding the proper use of the system.

150. As a direct result of their failure to properly oversee the use of the NCIC system, citizens' Fourth Amendment rights were routinely put at risk.

151. As a result of defendants' policies and customs surrounding the use of and failures to provide oversight and training for the NCIC system, plaintiff's constitutional rights were violated and plaintiff has suffered permanent physical injury, pecuniary losses, emotional distress and other damages, both compensatory and punitive, for which he seeks compensation.

### COUNT V MONELL LIABILITY FOR VIOLATION OF THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION UNDER 42 U.S.C. § 1983
#### Against Defendants City of August Police Department, Chief Jared Mills and Sergeant Tori Tracy

152. Plaintiff repeats and reasserts each and every allegation of the foregoing paragraphs as if fully set forth herein.

153. Defendants Augusta Police Department and Augusta Chief Mills have adopted a policy or custom of responding to other agency's requests to find someone subject to a "temporary felony want" without independently confirming whether the search, seizure arrest or detention of the individual is constitutionally supported.

154. Defendants Augusta Police Department and Augusta Chief Mills have adopted a policy or custom under which officers refer to "temporary felony wants" as "temporary warrants."

155. Referring to these requests as "temporary warrants" allows the mistaken belief that this process complies with Fourth Amendment warrant requirements to permeate daily law enforcement practice.

156. The misuse and misidentification of this process has allowed a culture, pattern or practice in which officers believe they are justified to take action based on a data entry as if they had a warrant when in fact no warrant exists.

157. In the instant case, Augusta police officers acted pursuant to this policy and custom to respond to Mr. Farrington's Augusta residence, in the dead of night, to effectuate an arrest for which they had no warrant.

158. This policy directly led to the violation of Farrington's constitutional rights.

159. Defendants Augusta Police Department and Police Chief Mills knew or should have known that this policy would lead to a violation of citizens' Constitutional rights.

160. As a result of defendants' policies and customs and failures to provide oversight and training regarding the use and reliance on the information in the NCIC system, Plaintiff's constitutional rights were violated and plaintiff has suffered permanent physical injury, pecuniary losses, emotional distress and other damages, both compensatory and punitive, for which he seeks compensation.

## COUNT VI VIOLATION OF MAINE CIVIL RIGHTS ACT

### Against Defendants City of Augusta Police Department, Mills, Tracy and Guptill

161. Plaintiff repeats and reasserts each and every allegation the foregoing paragraphs as if fully set forth herein

162. By virtue of the foregoing, the conduct of defendants violated plaintiff's right to be free from unreasonable search and seizure and the excessive use of force by police officers as established by the Fourth Amendment to the United States Constitution.

163. By virtue of the foregoing, the conduct of the defendants violated the plaintiff's right to be free from the use of excessive force by police officers as established by Article I, Section 5 of the Maine Constitution.

164. Defendants intentionally interfered with plaintiff's rights under the Maine and United States Constitutions by use of physical force and violence against him.

165. As a proximate result of the violation of plaintiff's constitutional rights, plaintiff has suffered pecuniary losses, emotional distress, physical injury, and other damages, both compensatory and punitive for which he seeks compensation.


## COUNT VII VIOLATION OF MAINE CIVIL RIGHTS ACT

### Against Defendants City of Fairfield Police Department, Gould and Willhoite

166. Plaintiff repeats and reasserts each and every allegation of paragraphs 1 to 167 as if fully set forth herein.

167. By virtue of the foregoing, the conduct of defendants violated plaintiff's right to be free from unreasonable search and seizure and the excessive use of force by police officers as established by the Fourth Amendment to the United States Constitution.

168. By virtue of the foregoing, the conduct of the defendants violated the plaintiff's right to be free from the use of excessive force by police officers as established by Article I, Section 5 of the Maine Constitution.

169. Defendants intentionally interfered with plaintiff's rights under the Maine and United States Constitutions by use of physical force and violence against him.

170. As a proximate result of the violation of plaintiff's constitutional rights, plaintiff has suffered pecuniary losses, emotional distress, physical injury, and other damages, both compensatory and punitive for which he seeks compensation.

## COUNT VIII VIOLATION OF MAINE CIVIL RIGHTS ACT
### Against Defendants Doe I, Doe II, Mike Smith, and Somerset County

171. Plaintiff repeats and reasserts each and every allegation of the foregoing paragraphs as if fully set forth herein.

172. By virtue of the foregoing, the conduct of defendants violated plaintiff's right to be free from unreasonable search and seizure and the excessive use of force police officers as established by the Fourth Amendment to the United States Constitution.

173. By virtue of the foregoing, the conduct of the defendants violated the plaintiff's right to be free from the use of excessive force by police officers as established by Article I, Section 5 of the Maine Constitution.

174. Defendants intentionally interfered with plaintiff's rights under the Maine and United States Constitutions by use of physical force and violence against him.

175. As a proximate result of the violation of plaintiff's constitutional rights, plaintiff has suffered pecuniary losses, emotional distress, physical injury, and other damages, both compensatory and punitive for which he seeks compensation.

## COUNT IX INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Defendant Guptill

176. Plaintiff repeats and reasserts each and every allegation of the foregoing paragraphs as if fully set forth herein.

177. Plaintiff had the right to be secure in his person, house, papers and effects.

178. Defendant had a duty to abide by Plaintiff's constitutionally protected rights.

179. By intentionally violating Plaintiff's constitutionally protected rights Defendants subjected Plaintiff to a hail of gunfire directed at him in his own home which caused emotional distress so severe that no reasonable person should be expected to endure it.

180. As a proximate result of Defendants' Intentional Infliction of Emotional Distress, Plaintiff suffered pecuniary losses, emotional distress, and other damages, both compensatory and punitive for which he seeks compensation.

## JURY TRIAL REQUEST

181. Plaintiff requests a trial by jury.

WHEREFORE Plaintiff prays for judgement on each and every count in an amount reasonably compensates for all damages, together with punitive damages, interest, costs and an award of reasonable attorney fees and other litigation costs incurred in the bringing of this action pursuant to 42 U.S.C. §§1983, 1985 and/or §12131, and 5 M.R.S.A. § 4683, to the highest extent allowable by law, from the earliest time allowable by lawn and grant such further relief as the Court may deem just and proper.

Dated this 25th day of September, 2023

/s/ *Kristine C. Hanly*

_____

Kristine C. Hanly, Esq., Bar No. 4500
Alexis G. Chardon, Esq., Bar No. 5932
Attorneys for Robert Farrington
GARMEY LAW
482 Congress Street, Suite 402
Portland, ME 04101
Tel: (207) 899-4644
khanly@garmeylaw.com
achardon@garmeylaw.com